UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION

**CIVIL ACTION NO. 1:05-CV-60-M**

| | |
|---|---|
| **SUDAMAX INDUSTRIA E COMERCIO DE CIGAROS, LTDA, et al.** | **PLAINTIFFS** |
| vs. | |
| **BUTTES & ASHES, INC., et al.** | **DEFENDANTS** |
| vs. | |
| **TANTUS TOBACCO, LLC** | **DEFENDANT/ THIRD PARTY PLAINTIFF** |
| vs. | |
| **DAVID LI MING YOUNG and YTC US, LLC** | **THIRD PARTY DEFENDANTS** |

**OPINION AND ORDER**

This matter is before the Court on the Cross Motions for Summary Judgment. For the reasons discussed below, the Plaintiff's Motion for Partial Summary Judgment is DENIED in part and GRANTED in part [DN59]. Defendant's Motion for Partial Summary Judgment is also GRANTED in part and DENIED in part [DN 91].

**I. Background**

Plaintiffs Sudamax Industria e Comercio de Cigarros, LTDA, et al. ("Sudamax"), brought suit alleging numerous claims against Defendants Butts & Ashes, Inc. et al. and Tantus Tobacco, LLC (collectively "Tantus"). Sudamax is a Brazilian corporation, and

Tantus is located in Kentucky. In 2003, Sudamax and Tantus entered into an oral contract. The agreement provided that Sudamax would manufacture cigarettes for Tantus to distribute to retail sellers.

Tantus and Sudamax agreed on the price and payment method for the cigarettes. Tantus agreed to pay the cost of shipping via sea and land from Brazil to Kentucky. In addition to agreeing upon the raw cost of the product, Sudamax and Tantus made provisions to comply with complicated regulatory laws related to the cigarette industry. As part of the 1998 Master Settlement Agreement between cigarette manufacturers and 46 states, manufacturers such as Sudamax were required to escrow funds each year, and each individual state required a separate escrow payment. The amount due for escrow was determined by the number of cigarettes sold in the state in the prior year. After the escrows were deposited with each state, the regulations indicated that a percentage of the money would be returned to the manufacturer. As a Brazilian manufacturer, Sudamax had reservations about its ability to deal with the complicated regulations related to the escrow payments. To secure the contract with Sudamax, Tantus agreed to make the necessary escrow payments with each state. Tantus and Sudamax also agreed that the escrow refunds would be returned to Tantus.

The arrangement between Tantus and Sudamax started well, but problems ensued. Tantus claims that shipments were delayed and contained defective product, such as cigarettes containing faulty filters and insects. Sudamax claims that delays in shipment were related to problems with Brazilian customs authorities. As a result of the delays, several

shipments were shipped via air, rather than sea, causing Tantus to incur greater shipping costs than expected. Despite these problems, Tantus made the first annual escrow payments in 2004, which related to 2003 sales. As expected, Tantus received a refund from most states, however, two states have retained those funds and refuse to release them to Tantus. Tantus alleges that Sudamax is responsible for this occurrence.

During their dealings, Tantus continually complained to Sudamax about the defective product and late shipments. Tantus eventually quit paying for the product it received from Sudamax, claiming that Sudamax breached the agreement by claiming ownership of the escrowed funds which had not yet been refunded. Although Tantus sold cigarettes manufactured by Sudamax during 2004, it made no escrow payments related to those sales when deposits were due in 2005.

In its Motion for Summary Judgment, Sudamax requests summary judgment in its favor on Counts IV, V, and VI of the Complaint. These counts allege a breach of contract for failure to make the escrow payments, and non-payment for cigarettes tendered. Sudamax seeks over $1.3 million plus interest in payment for the cigarettes, and nearly $5 million related to the non-payment of escrow deposits. In its Cross-Motion for Summary Judgment, Tantus seeks summary judgment in its favor on Counts I, II, III, IV, VII, and VIII. These counts relate to injunctive relief preventing Tantus from selling Berkley or Berley brand cigarettes; a breach of an alleged fiduciary duty; fraud; and payment of escrows. Tantus also seeks a judgment establishing its ownership of the funds still in escrow in Missouri and Tennessee.

## II. Standard of Review

In order to grant a motion for summary judgment, the Court must find that the pleadings, together with the depositions, interrogatories, and affidavits, establish that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than show there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The Rule requires the non-moving party to present "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e) (emphasis added). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

## III. Discussion

In Sudamax's Motion for Partial Summary Judgment, Sudamax claims that Tantus is liable for the payment of goods received and for the non-payment of the escrow deposits.

In its Cross-Motion, Tantus requests judgment regarding Sudamax's requested injunctive relief, claims of fraud, breach of fiduciary duty, and payment of escrows. The claims of both parties will now be discussed.

### A. Action for Price and Action on Open Account

In Counts V and VI of the Complaint, Sudamax alleges that Tantus is liable for the cost of cigarettes that it accepted but did not pay for. It is undisputed that Tantus received product for which it has not yet paid. KRS 355.2-709 provides that "[w]hen the buyer fails to pay the price as it becomes due the seller may recover" the price of accepted goods. Tantus accepted all the goods shipped by Sudamax and did not reject any shipments. Under KRS 355.2-709, Tantus is liable for the cost of the tendered cigarettes, which Sudamax alleges is over $1.3 million. But the amount of damages due to Sudamax cannot be determined at this time due to the counterclaim of Tantus.

The claim is controlled by KRS 355.2-714(1), which provides:

> Where the buyer has accepted goods and given notification [of a breach] . . . he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

The law states that when a buyer notifies a seller of nonconforming product, the buyer may recover for the nonconformity. Tantus provided notice to Sudamax of the non-conformance of the cigarettes it received. Thus, Tantus may be able to recover for the nonconformity.

Questions of material fact remain as to Counts V and VI because it is unclear as to the amount of offset, if any, Tantus is entitled to based on the nonconformity of tender in Sudamax's product. See Galigher Trucks, Inc. v. McKenzie, 553 S.W.2d 294, 295 (Ky.App. 1977)(when non-conforming product was delivered, buyer should have been allowed to offset the contract price with the lower reasonable market value of the non-conforming product); Belcher v. Hamilton, 475 S.W.2d 483, 485 (Ky. 1971)(damages calculated by determining difference in value of product as delivered and value of product if it had been soundly constructed). These questions of material fact render summary judgment on Counts V and VI inappropriate at this time.

**B.  Breach of Contract and Injunctive Relief Related to Escrow Payments**

In Count I of the Complaint, Sudamax requests injunctive relief to require Tantus to make escrow payments. In Count IV, Sudamax alleges a breach of contract based on Tantus's failure to make escrow payments. Tantus concedes that the facts represented by Sudamax are true, and submits that this issue is ripe for summary judgment. DN 128, p.6. Both parties acknowledge that Tantus agreed to make the escrow payments related to the sales of Sudamax product. Despite the nuances in the arguments the parties present, the essential terms of the agreement between Tantus and Sudamax were clear. When Tantus ordered cigarettes, a percentage of the price was due at the time of order and the balance was due later. See DN 1, p. 7-8. Both parties agree that the price accounted for the fact that it was planned for Tantus to make the necessary escrow payments for cigarettes sold. DN 59, Ex. A, p. 56; DN 66, p.6. As such, the necessary escrow payments were a contemplated

6

portion of the price, and it was agreed that Tantus would bear this portion of the product's price. Both parties agree that Tantus was expected to receive all releases of the escrow funds as well. See DN 66, Exhibit A, p. 136.

"The general rule is that a person undertaking the performance of certain obligations must perform same, unless the performance thereof is rendered impossible by act of God, by the other party, or by operation of law." Rodgers v. Larrimore & Perkins, 188 Ky. 468 (Ky.App. 1920). Unforeseen difficulties do not alone constitute an excuse. Fritz-Rumer-Cooke Co. v. U.S., 279 F.2d 200, 201 (6th Cir. 1960).

Tantus submits that there are several reasons that excuse its failure to pay the 2004 escrows in the April of 2005. These potential excuses for performance will be addressed in turn.

### 1. Sudamax interfered with or prevented the release of the funds

In April of 2005, when escrows were due for 2004 sales, Tantus had not received the escrow refunds that were expected from escrows made for 2003 sales. The states of Tennessee and Missouri continued to hold the escrows from 2003. The amount held which Tantus had expected to receive was over $600,000. Tantus asserts that it needed to attain this refund in order to be able to make the 2004 payments. Tantus further argues that the fact it had not received the escrow refunds was part of the reason for Tantus's failure to make escrows in 2005. Tantus submits that it was the fault of Sudamax that Tantus did not receive the refunds in order to make the payments in April, 2005.

In the fall of 2004, Tantus requested that Sudamax contact the state Attorneys General

to clarify that it was the manufacturer and that it was acquiring Samurai, which had been listed as the manufacturer of Berkley cigarettes. Sudamax complied with the request and informed the states that it was the manufacturer of the cigarettes and that it was therefore responsible for escrow compliance. See DN 118, Ex. D. Although Sudamax took legal responsibility for the escrow accounts at Tantus's request, the expectation remained that Tantus would make the escrows for 2004 in the Spring of 2005.

Because Sudamax was the manufacturer, it held responsibility for the escrows and possessed the escrows despite Tantus's contractual obligation to make deposits. Problems had developed between Sudamax and Tantus before the escrows were due in 2005. Tantus therefore submits that it was reasonable to request Sudamax to provide assurance that if Tantus deposited the escrows for 2004, the refunds would be returned to Tantus as originally agreed. Tantus argues that because Sudamax did not provide assurances that the funds would revert to Tantus, Tantus's nonperformance is excused.

KRS § 355.2-609(1) states that reasonable assurances can be requested for goods not yet provided. The statute reads:

> A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

Here, Tantus owed the escrows as part of the price owed for cigarettes that Sudamax

8

had already provided. Sudamax had already provided the goods, meaning that Tantus's obligation to pay for the goods had been triggered when the cigarettes were provided. Under KRS 355.2-609, Tantus had already received the agreed return (the cigarettes) and thus could not suspend its performance (the payment of escrows) based on a lack of assurances from Sudamax. The goods for which Tantus owed had already been tendered. If Tantus was fearful that Sudamax would not return the escrow payments, Tantus was left with remedies at law if Sudamax indeed failed to return the payments. Instead, Tantus failed to make the escrow payments in breach of the parties' oral agreement. No evidence indicates that Sudamax prevented Tantus from receiving the refunds. The refunds were retained by the states because of questions as to what entity actually manufactured the cigarettes. And Sudamax claimed responsibility for the escrows only after Tantus requested them to do so. Sudamax's actions were not the cause of Tantus's breach, and do not create an excuse for Tantus's non-performance.

**2. Sudamax's declaration of ownership of the funds was an anticipatory repudiation and excused Tantus's performance**

In early 2005, Tantus owed Sudamax payment for cigarettes. In addition to the payment owed directly to Sudamax, the oral agreement called for Tantus to make the escrow payments for those cigarettes. The parties agree that Tantus was to receive any refunds from the escrowed funds. But before making payment for the 2004 escrows, Tantus sought an assignment of the escrow refunds. On February 16, 2005, Sudamax's counsel drafted a letter to Tantus indicating that Sudamax would not assign the escrow refunds to Tantus unless

9

Tantus satisfied its outstanding debts to Sudamax. See DN 66, Ex. I.

Tantus argues that the failure to assign the refunds to Tantus creates an excuse for Tantus's failure to make escrow payments in 2005. As discussed above, however, Tantus was obligated to make the escrow payments as part of the payment owed for goods previously tendered to Sudamax. KRS 355.2-609 does not entitle Tantus to refuse payment for goods which it had already received. KRS 355.2-610 provides that if a party repudiates its performance, the aggrieved party may suspend his own performance. Here, Sudamax did claim ownership over the escrowed funds but only at the request of Tantus. Such action was deemed necessary in order to accomplish the refunds Tantus sought. At the time, Tantus and Sudamax were involved in a dispute over payment for and conformity of goods delivered. Tantus requested an assignment fearing that if Sudamax received the refunds, it would retain them as payment for the goods delivered. Sudamax's refusal to execute an assignment to calm Tantus's fear is not a repudiation of the contract. Sudamax has never claimed it was entitled to keep the refunds. If Sudamax had failed to tender the refunds, Tantus could have sought legal remedies for breach. Sudamax's failure to execute an assignment of the funds does not excuse Tantus's nonpayment of the escrows.

### 3. Change in the escrow release provisions was a force majeure occurrence

Tantus chose which states it wished to sell cigarettes in according to escrow release provisions following the Master Settlement Agreement. In 2004, some states amended their escrow release provisions. In Tennessee, where the escrow release has led to the particular difficulty in this matter, the escrow release provisions were amended in April, 2004. See

T.C.A. § 47-31-103.  The amendment created a situation much less favorable for manufacturers seeking refunds of their escrowed deposits.  As a result, following the 2004 amendment, Tantus would have to wait much longer for a refund than it had previously expected.

Tantus argues that the amendments in the refund provisions constituted a force majeure occurrence which excuses Tantus's non-payment of the deposits.  Force majeure is defined as "an event or effect that can be neither anticipated nor controlled."  Black's Law Dictionary (8th ed. 2004).  But both parties concede that exceptions for force majeure occurrences were not contemplated at the time of the original agreement.  See DN 66, p. 6; see also DN 66, Exhibit A, p. 124.  The concept of force majeure, however, can be compared to the modern UCC concept of impracticability.  In its later pleadings, Tantus shifted its emphasis in argument from that of force majeure to impracticability.  Impracticability is "a fact or circumstance that excuses a party from performing an act, esp. a contractual duty, because (though possible) it would cause extreme and unreasonable difficulty."  Blacks Law Dictionary (8th ed. 2004).

Two factors prevent impracticability from excusing Tantus's nonperformance.  First, impracticability is a seller's excuse, not that of a buyer.  KRS 355.2-615 provides that "[d]elay in delivery or nondelivery in whole or in part by a seller . . . is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable."  The Kentucky code makes no mention of the excuse of impracticability being extended to buyers. See Kentucky Utilities Co. v. South East Coal Co., 836 S.W.2d 392, 397 (Ky.

11

1992)(impracticability does not excuse a buyer since section 2-615 expressly refers to sellers). Thus, impracticability does not excuse Tantus's nonperformance.

A second factor also invalidates the excuse of impracticability. The escrow provisions in Tennessee changed in April, 2004. Yet Tantus continued to place cigarette orders with Sudamax throughout the balance of 2004. If the amended provisions of state escrow laws created conditions unfavorable to Tantus, it was Tantus's responsibility to realize that before accepting additional product from Sudamax. The change in the law does not excuse Tantus's failure to make escrow deposits as had been agreed.

**4. A YTC affiliate failed to make escrows, and thus Tantus's failure created no further damages**

Sudamax is owned primarily by David Young. David Young has a U.S. manufacturing company as well, named YTC. YTC manufactured cigarettes during 2004, and Tantus suggests that YTC failed to make escrow payments for the cigarettes it manufactured. Tantus is not specific as to what states YTC may have failed to make payments. Tantus's argument is that if YTC failed to make payments that it is non-compliant, and that as a result, all of its affiliated companies will be deemed non-compliant as well. Thus, if YTC failed to make payments, Sudamax would be non-compliant as well as an affiliated company of YTC. See, e.g., K.R.S. 131.600; K.R.S. 131.610. Tantus argues that it's failure to make payments on escrows therefore created no further damages than those already created by YTC.

This argument fails. Tantus had a contractual duty to deposit the escrows. That duty

was not relieved by the unrelated actions of YTC. While the non-compliance of YTC could potentially affect the matter of damages, it does not impact the liability of Tantus. Tantus agreed to make escrow payments for the cigarettes it purchased, and the actions of YTC did not excuse its non-performance.

The Court has determined that there is no material mistake of fact as to the liability of Tantus regarding the outstanding escrow payments. No excuse that Tantus has offered serves to excuse its nonperformance. Injunctive relief is not appropriate at this time, but Sudamax is entitled to summary judgment as to the liability portion of Count IV. Damages, however, remain undetermined at this time and material issues of fact still remain. Therefore, this matter is referred to the Magistrate to conduct a scheduling conference designed to determine how best to present the issue of damages for resolution. The parties are encouraged to request the Magistrate to engage in a settlement conference at the same time.

### C. Injunctive Relief

In Count II of the Complaint, Sudamax sought injunctive relief to prevent Tantus from selling Berkley and Berley branded cigarettes. Tantus requested summary judgment in its favor on this count, and Sudamax has agreed to dismiss the request for injunctive relief. Thus, Count II is dismissed.

### D. Breach of Fiduciary Duty

Sudamax alleges in Count III of the Complaint that Tantus breached a fiduciary duty owed to Sudamax. A fiduciary relationship is "one founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking." Steelvest, Inc. v. Scansteel Service Center, Inc., 807 S.W. 2d 476, 485 (Ky. 1991). Here, there was a contractual agreement where both parties were acting in their own interest. Sudamax has not alleged that Tantus held a duty to act primarily for Sudamax's benefit. Absent a confidential relationship between the parties, a contractual agreement between a buyer and a seller does not create a fiduciary relationship. Anchor v. O'Toole, 94 F.3d 1014, 1024 (6th Cir. 1996). The Sixth Circuit has rejected arguments that the specialized knowledge possessed by a seller creates fiduciary obligations to buyers. Greenberg v. Life Ins. Co. of Virginia, 177 F.3d 507, 521-22 (6th Cir. 1999). Most buyers and sellers work at arms-length to protect their own interests. Id. Just as it was inappropriate to impose fiduciary obligations upon a seller in Greenberg, here it is inappropriate to impose fiduciary obligations upon a buyer when both buyer and seller were acting in their own interests. As buyer and seller there was no fiduciary relationship between Tantus and Sudamax; thus, there can be no breach of fiduciary duty. Summary judgment on Count III is granted in favor of Tantus.

### E. Fraud

In Counts VII and VIII of Sudamax's complaint, Sudamax alleges against Tantus claims of fraud, constructive fraud, and conspiracy to defraud. Sudamax now agrees to dismiss Counts VII and VIII, and the Counts are dismissed at the request of the Plaintiffs.

### IV. Conclusion

For the reasons discussed above, Sudamax's Motion for Partial Summary Judgment is GRANTED in part, and DENIED in part[DN 59]. Summary Judgment as to liability on Count IV is GRANTED to Sudamax. Counts II, VII, and VIII of the Complaint are hereby DISMISSED at the request of Sudamax. Defendant Tantus's Motion for Partial Summary Judgment is GRANTED in part and DENIED in part [DN91]. Summary Judgment is GRANTED to Tantus on Count III.

cc: counsel of record